UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHEILA F. JOHNSON,

               Plaintiff,                     Case No. 2:17-cv-10147
                                            Chief Judge Denise Page Hood

v.                                    Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.

_____/

**<u>REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT (DE 15), GRANT DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (DE 18) AND AFFIRM THE
COMMISSIONER'S DECISION</u>**

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (DE 15), **GRANT** Defendant's motion for summary judgment (DE 18),

and **AFFIRM** the Commissioner's decision.

**II.**    **REPORT**

      Plaintiff, Sheila F. Johnson, brings this action under 42 U.S.C. § 405(g) for

review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for disability insurance (DI) benefits.

This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 15), the

Commissioner's cross-motion for summary judgment (DE 18), Plaintiff's reply (DE 19), and the administrative record (DE 12).

### A.    Background and Administrative History

Plaintiff alleges her disability began on April 4, 2013, at the age of 52.  (R. at 215.)  She lists several conditions (neck/back injuries, nerve damage in the neck and back, and hypertension (HTN)) that limit her ability to work.  (R. at 248.)  Her application for DI benefits was denied on December 10, 2014.  (R. at 157.)

Plaintiff requested a hearing by an Administrative Law Judge ("ALJ").  (R. at 165-166.)  ALJ Joy Turner held a hearing, and, on November 4, 2015, determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 17-71.)  On November 23, 2016, the Appeals Council denied Plaintiff's request for review.  (R. at 1-6, 14-16.)  Thus, ALJ Turner's decision became the Commissioner's final decision.

Plaintiff timely commenced the instant action on January 17, 2017.  (DE 1.)

### B.    Plaintiff's Medical History

The administrative record contains approximately 92 pages of medical records, all of which were available to the ALJ at the time of her November 4, 2015 decision.  (R. at 31, 283-374 [Exhibits 1F-8F].)  These records will be discussed in detail, as necessary, below.

### C.    Hearing Testimony

### 1.     Plaintiff's Testimony

Plaintiff testified at the October 6, 2015 hearing, when she was 55 years old. (R. at 37-67.)  As Plaintiff is not expressly challenging the ALJ's credibility assessment in the instant appeal, the Court will forego further summary of her testimony here and will only refer to it as necessary below.

### 2.     Vocational Expert Testimony

Vocational expert (VE) Zachary A. Matthews testified at the hearing, providing answers to 4 hypothetical questions.  (R. at 67-70, 276-279.)  Among other things, he testified that a hypothetical individual with the RFC eventually adopted by the ALJ (namely, including the manipulative limitations of frequent handling, fingering, and feeling and no reaching overhead) could perform other work.  (R. at 68-69.)

### D.     The Administrative Decision

The record includes prior unfavorable ALJ hearing decisions dated July 11, 2011 and April 3, 2013.  (R. at 106-122, 127-141.)  Applying the latter decision, ALJ Turner stated that Plaintiff "must present material evidence that her condition changed *between the date of the prior ALJ decision, which is April 3, 2013[,] and the date last insured of December 31, 2013* in order for the undersigned to arrive at a different RFC finding, and consequently, a different decision."  (R. at 21 (emphasis added).)

3

On November 4, 2015, ALJ Turner issued her decision in the present case. (R. at 17-31.)  At **Step 1** of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of April 4, 2013 through her date last insured of December 31, 2013.  (R. at 23.)  At **Step 2**, the ALJ found that Plaintiff had the following severe impairments:  anemia, disorder of the spine, degenerative joint disease, obesity and hypertension.  (*Id*.)  At **Step 3**, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (*Id*.)  Between **Steps 3 and 4** of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[2] and determined that, through the date last insured, Plaintiff had the RFC:

> .  .  . to perform a range of light work as defined in 20 CFR 404.1567(h) reduced by the following limitations and restrictions: frequent handling, fingering and feeling [*manipulative limitations*]; sit/stand option at will; requires use of a cane while walking hut not while standing at a work station; no reaching overhead [*a manipulative limitation*]; occasional climbing ramps, stairs, ladders, ropes and scaffolds; occasionally balance, stoop, crouch, kneel and crawl.

---

[1] *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[2] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); *Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

(R. at 24-26.)  At **Step 4**, the ALJ determined that, through the date last insured, Plaintiff was unable to perform any past relevant work.  (R. at 26.)  At **Step 5**, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that, through the date last insured, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. (R. at 26-27.)  The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time from April 4, 2013, the alleged onset date, through December 31, 2013, the date last insured.  (R. at 27.)

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241

(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F.    Analysis

### 1.    The RFC contained specific, manipulative limitations.

The ALJ adopted an RFC with manipulative limitations of "no reaching

overhead," and "frequent handling, fingering and feeling," and referenced:

- A June 26, 2012 lumbar spine MRI, which revealed:  (1) "Mild early degenerative disk disease at the level of L4-LS without any disk material herniation[,]" and (2) "Degenerative disk disease at L5-S1 with generalized annulus bulge with effacement of the anterior thecal sac and slight encroachment upon the neural foramina bilaterally at this level."  (R. at 361-362.)

- A June 21, 2013 nerve conduction study / electromyogram (NCS/EMG) report, which concluded, among other things, including several "normal" findings and/or readings "within normal limits", that "Left L5/S1 radiculopathy unlikely[,]" and "Non-specific F-wave abnormality on right, *may* indicate L5/S1 radiculopathy."  (R. at 295-299, 296) (emphasis added).

- The January 7, 2015 notes of Roderick Claybrooks, M.D., who had reviewed the June 30, 2014 cervical spine MRI and who assessed, among other things, "Lumbar, spinal stenosis [without] neurogenic claudication[.]"  (R. at 312-314, 345; *see also* R. at 341.)[3]

- Dr. Claybrooks's February 26, 2015 operative report, as evidence that "surgical intervention was necessary . . . ."  (R. at 357-360.)

(R. at 24-25.)  Then, after acknowledging that EMG/NCS results showed

"abnormalities across both wrists[,]" or "some nerve involvement with the bilateral

---

[3] Although the ALJ interpreted this diagnosis as relating to L4-L5, Dr. Claybrooks made this diagnoses as to L5-S1 as early as July 23, 2014, at which point he had considered the June 27, 2014 lumbar spine MRI.  (*Compare* R. at 25 *with* R. at 306, 315-317; *see also* R. at 338, 341, 345, 349.)

wrists[,]" the ALJ "included restrictions for frequent (as opposed to constant) use of the upper extremities for fingering, feeling and handling." (R. at 25.) In the end, the ALJ noted: "Claimant's back and neck disorders are addressed by limitations to light work with sit/stand option and occasional postural activities. Claimant's neck disorder and upper extremity symptoms (weakness and numbness) [are] addressed by restrictions of frequent use of upper extremities for feeling, fingering and handling as well as no overhead lifting or reaching." (R. at 26.)

### 2.   There are a significant number of jobs in the national economy that Plaintiff can perform.

Plaintiff contends that the medical evidence of record only supports *occasional* (as opposed to *frequent*) handling, fingering, and feeling. (DE 15 at 12-15, DE 19 at 2-3.) To the extent Plaintiff points to the June 21, 2013 NCS / EMG report (which revealed that Plaintiff's left ulnar amplitude, right median amplitude and right tibial A-wave were each "outside normal limits"), the ALJ expressly considered this piece of evidence and acknowledged that "[t]here were abnormal findings related to the bilateral wrists." (R. at 24, 296.) In fact, while Plaintiff contends that "it is unclear . . . *how* the ALJ came to the conclusion that the Plaintiff should be limited in her manipulative functioning to a 'frequent' basis[,]" (DE 15 at 14 (emphasis added)), as noted above, it is clear that this piece of evidence was *the basis* for the ALJ's assessment of "frequent" – not "constant" - use of the upper extremities "for fingering, feeling and handling." (R. at 25.)

Perhaps more critically, Plaintiff points to the physical RFC questionnaire form completed by Dr. Petty, who opined that Plaintiff had "significant limitations" with "reaching, handling or fingering" and that Plaintiff could use her hands (to grasp, turn and twist objects), her fingers (for fine manipulations) and her arms (for reaching, including overhead) for 10-15 % of an 8-hour working day, except that she could use her left hand 20% of an 8-hour working day.  (R. at 324.) "Frequently" means that "the activity or condition occurs one-third to two-thirds of an 8-hour workday[,]" and "Occasionally" means that "the activity or condition occurs at least once up to one-third of an 8-hour workday."  POMS DI 25001.001. As such, Plaintiff contends that Dr. Petty's assessment is consistent with only "occasional" – not "frequent" - reaching, handling and fingering.  (DE 15 at 13.)

The Commissioner concedes this point for the sake of argument, and, instead, argues that any such error is harmless.  (DE 18 at 4-6.)  The Court should agree.  The VE testified that a hypothetical person with an RFC as eventually adopted by the ALJ in Plaintiff's case could perform the positions of record clerk (241.367-038), of which there were 46,000 nationally; information clerk (237.367-018), of which there were 54,000 nationally; and office clerk (209.667-014), of which there were 179,000 nationally.  (R. at 24, 69.)  These were the positions expressly cited by the ALJ at Step 5.  (R. at 27.)  As the Commissioner notes, the "record clerk" position – actually named "investigator, dealer accounts" - requires

9

only occasional reaching, handling and fingering, and does not involve feeling. *See* DICOT 241.367-038 (G.P.O.), 1991 WL 672258.  Moreover, 46,000 such jobs in the national economy constitutes a "significant number."  *See Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) ("Six thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant.'"); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009) (treating 2000 assembly jobs in national economy as a significant number).

Plaintiff claims that a hypothetical involving "occasional" manipulative limitations could have resulted in testimony that such an individual was "work precluded" or limited to "sedentary work."  (DE 15 at 13.)  Nonetheless, the VE testified that a person with Plaintiff's RFC – including a limitation of "no reaching overhead" - could perform the record clerk / investigator, dealer accounts position. (R. at 68-69.)    This position exists in significant numbers and requires only occasional reaching, handling and fingering, and does not involve feeling.  As such, this Court is not "left to guess whether . . . a limitation to 'occasional' . . . would ultimately lead to a finding of 'disabled'."  (DE 15 at 14.)  Here, "even if the ALJ had adopted [the] treating physician's [limitation of only occasional handling, fingering and feeling], the ALJ's ultimate conclusion at Step Five likely would have been the same." *Keels v. Comm'r of Soc. Sec.*, No. 14-12057, 2015 WL 3843552, at *2 (E.D. Mich. June 22, 2015) (Cox, J., *adopting in part and*

10

*rejecting in part report and recommendation of* Grand, M.J.) ("Thus, this Court finds that the ALJ's error, if any, is harmless, and remand is not warranted.").

### 3.   Plaintiff has not shown reversible error in the ALJ's treatment of opinion evidence.

The ALJ states that he considered the opinion evidence in accordance with 20 C.F.R. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017.") and SSR 96-2p ("Giving Controlling Weight to Treating Source Medical Opinions."). (R. at 24.) Plaintiff challenges this assertion. (DE 15 at 15-17, DE 19 at 3-4.)

Section 404.1527 provides that the SSA evaluates every medical opinion it receives and, unless it gives a treating source's medical opinion controlling weight, it considers several factors − examining relationship, treatment relationship, supportability, consistency, specialization, and other factors − in deciding the weight it gives to any medical opinion. 20 C.F.R. §§ 404.1527(c). The related Social Security Ruling provides that "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2P (S.S.A. July 2, 1996).

### a.   Tariq Mahmood, M.D. (state agency medical consultant)

On December 9, 2014, state agency medical consultant Dr. Mahmood opined that Plaintiff was exertionally limited to light work; was posturally limited

to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling; but, did not have any manipulative, visual, communicative or environmental limitations.  (R. at 152-154.)  In assigning this assessment "some weight," the ALJ stated:

> Dr. Mahmood indicated that claimant retained an RFC for a range of light exertion work reduced by occasional postural limitations.  The undersigned found that claimant's medical records suggest more restrictions.  Specifically, EMG/NCS results show some nerve involvement with the bilateral wrists.  Accordingly, the undersigned included restrictions for frequent (as opposed to constant) use of the upper extremities for fingering, feeling and handling.

(R. at 25.)  In Plaintiff's case, the ALJ adopted Dr. Mahmood's exertional limitations (which were consistent with light work as defined by 20 C.F.R. § 404.1567(b)), added a sit/stand at will option and use of cane while walking but not while standing at a work station, and adopted Dr. Mahmood's postural limitations.  At the same time, the ALJ adopted stricter manipulative limitations of frequent handling, fingering and feeling with no overhead reaching.  (R. 24, R. 152-154.)  In other words, the ALJ discounted Dr. Mahmood's manipulative limitation assessment as *inconsistent with* the EMG/NCS results.  20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

### b.    Mary E. Petty-Dudley, M.D.

### i.     Treating Physician

The ALJ and Plaintiff describe Dr. Petty as Plaintiff's "treating *physician*." (R. at 25 (emphasis added), DE 15 at 15.)  Thus, it is clear that the ALJ's consideration of Dr. Petty's opinions was informed by the "examining relationship" and "treatment relationship" factors, although the lack of a specialty on Dr. Petty's letterhead suggests that she is a general practitioner, thus making it unnecessary for the ALJ to address the "specialization" factor. (*See*, *e.g.*, R. at 293-304, 374).  20 C.F.R. §§ 404.1527(c)(1),(2),(5), 416.927(c)(1),(2),(5).

The Commissioner questions the description of Dr. Petty as a treating physician, and bases her inquiry on 20 C.F.R. § 404.1502 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."), *Sedore v. Colvin*, No. 1:13CV849, 2014 WL 4080265, at *5 (W.D. Mich. Aug. 13, 2014) ("Plaintiff did not carry her burden of presenting evidence establishing that Dr. Johnson was a treating physician."), and *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) ("depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship.").  (DE 18 at 6-7.)

The Court will assume that Dr. Petty is a treating source for purposes of this report and recommendation.  Dr. Petty claims that her first visit with Plaintiff occurred during 2008.  (R. at 321.)  Also, within the current administrative record, the Court has found several medical records related to Dr. Petty that span a period from April 10, 2014 through April 23, 2015 and conclude with the August 13, 2015 physical RFC questionnaire.  (R. at 300-304, 312-318, 293-294, 374, 320-324.)  In addition, Dr. Petty is identified as the PCP, or primary care physician, in Dr. Claybrooks's notes (dated June and July 2014, as well as January, February and March 2015) and the June 12, 2014 notes of Manisha Mehta, DPM.  (R. at 305, 308, 337, 340, 344 and 331.)  Furthermore, Dr. Petty is listed in the February 2015 and March 2015 discharge summaries as the "follow-up" doctor, and, as to the latter hospital stay, Dr. Petty saw Plaintiff post-operatively.  (R. at 367, 372).  Therefore, the Court is comfortable treating Dr. Petty as a "treating source," who provides or has provided Plaintiff "with medical treatment or evaluation" and who has or has had "an ongoing treatment relationship" with Plaintiff.  20 C.F.R. § 404.1502.

### ii.      Treatment of Dr. Petty's opinions

As previously noted, Dr. Petty opined that Plaintiff had "significant limitations with reaching, handling or fingering[.]"  (R. at 324.)  After the ALJ

noted that Dr. Petty's limitations and restrictions were *consistent with* disability,

she stated:

> The undersigned reviewed the records submitted by Dr. Petty (Exhibit C3F [R. at 305-318]). Her assessment does not indicate whether the restrictions she suggested were applicable to the period of consideration, which ended December 31, 2013. The medical records do not reveal objective medical evidence showing conditions warranting the suggested limitations until after December 31, 2015.[4] Only claimant's acute cervical disc disease with pain (7-8 out of 10) and findings *consistent with* lumbar stenosis would support limitations noted by Dr. Petty. Evidence establishing these conditions show that claimant did not begin to experience symptoms of this severity until 2014 and 2015. Claimant had cervical decompression fusion surgery from C4 to Tl and C4 to C7 in February 2015 (Exhibit C7F [R. at 336-372]).[5]

(R. at 25.) Although the ALJ did not make a specific assignment of weight to Dr.

Petty's medical source statement, it is clear the ALJ discounted its conclusions as

inconsistent with or unsupported by medical record evidence predating December

31, 2013, the date last insured, of which there was none. 20 C.F.R. §§

404.1527(c)(4), 416.927(c)(4). *See also* 20 C.F.R. §§ 404.1527(c)(3),

416.927(c)(3) ("The more a medical source presents relevant evidence to support a

medical opinion, particularly medical signs and laboratory findings, the more

weight we will give that medical opinion. The better an explanation a source

---

[4] As did the Commissioner, the Court assumes that this is a typographical error and that the date was intended to be December 31, 2013, the date last insured. (*See* DE 18 at 8-9 n.5.)

[5] More accurately, the C4-C7 surgery was performed in February 2015, and the C4-T1 surgery was performed in March 2015. (R. at 351-372.)

provides for a medical opinion, the more weight we will give that medical

opinion.").  The Commissioner appears to be correct that, other than the June 21,

2013 NCS/EMG Report (R. at 295-299)[6] – to which the ALJ expressly referred in

the RFC determination (R. at 24-25), which is a subject of Plaintiff's first

statement of error (DE 15 at 13), and the ALJ's treatment of which is addressed

above – "there is nothing in the record from Plaintiff's alleged onset date [April 4,

2013] through her date last insured [December 31, 2013] showing that her cervical

and lumbar spine impairments were disabling."  (DE 18 at 9.)

### iii. Plaintiff has failed to show reversible error in the ALJ's treatment of Dr. Petty's medical source opinion.

Plaintiff takes issue with the ALJ's statement that Dr. Petty's "assessment

does not indicate whether the restrictions she suggested were applicable to the

period of consideration, which ended December 31, 2013."  (R. at 25, DE 15 at 16-

17.)  This appears to be a misstatement by the ALJ, as each page of Dr. Petty's

questionnaire is boldly marked, "*PLEASE IDENTIFY THE PATIENT'S*

*CONDITIONS PRIOR TO 12/31/13*."  (R. at 321-324.)  On the other hand, as the

Commissioner points out, Dr. Petty's form appears to refer to either or both of

Plaintiff's February and March 2015 surgeries, as she seems to have written "post

---

[6] In the words of the ALJ, "NCS/EMG studies from June 2013 were inconclusive regarding L5/S1 radiculopathy, with results suggesting only possible indication of right L5/S1 radiculopathy and unlikely left L5/S1 radiculopathy[.]"  (R. at 24.)

fusion" in describing Plaintiff's diagnoses; as such, Dr. Petty appears to have been working off of a post-fusion, post-date last insured diagnosis, not the "prior to 12/31/13" referenced in the form.  (R. at 321, DE 18 at 10.)  Likewise, her prognosis of "fair" appears to relate to this same, post-insured period.  (R. at 321.)  Thus, even if Dr. Petty noticed the directive to limit her opinion to "prior to 12/31/13," she does not appear to have followed it.

This question need not be resolved here, as Plaintiff has failed to show that any error in this statement constitutes reversible error.  Plaintiff contends that "the ALJ goes on to discount the opinion with evidence post-DLI[,]" and argues that "an inconsistent explanation for rejecting Dr. Petty's opinion cannot constitute the 'good reasons' contemplated by SSR 96-2p."  (DE 15 at 17, DE 19 at 4.)  The Undersigned disagrees with this characterization of the ALJ's discounting.

Notwithstanding her above-described "misstatement," the ALJ stated that she reviewed the records submitted by Dr. Petty and references Exhibit C3F.  (R. at 25, 305-318.)  These include Plaintiff's June 2014 cervical and lumbar spine MRIs (R. at 312-317) and Dr. Claybrooks's July 23, 2014 progress notes, which, among other things:  **(a)** acknowledge review of the June 27, 2014 lumbar spine MRI; **(b)** diagnose "cervical, spinal stenosis," at C4 to C7 and "lumbar, spinal stenosis w/o neurogenic claudication" at L5S1; and **(c)** note "there was indication for surgical intervention" and Plaintiff "would like to consider her options."  (R. at 306.)

Other records from Michigan Spine and Brain Surgeons continue the timeline of Plaintiff's spinal stenosis.  (R. at 336-372 [Ex. C7F].)  Dr. Claybrooks's October 1, 2014 notes indicate that Plaintiff "states she would like to postpone surgery until the first of the year[,]" and planned "for surgery in January."  (R. at 349.)  In January and February 2015, Plaintiff "agreed to proceed with surgery."  (R. at 341-342, 345-346.)  She was hospitalized from February 26, 2015 to March 2, 2015 for an anterior cervical decompression and fusion C4 through C7.  (R. at 352-353, 357-360, 365-366, 372.)  Shortly thereafter, on March 5, 2015, Plaintiff underwent a decompressive posterior cervical fusion C4 through T1 and apparently remained in the hospital until March 13, 2015.  (R. at 351, 354-356, 363-364, 367-371.)  Dr. Claybrooks continued to assess C4-C7 cervical spinal stenosis and "lumbar, spinal stenosis w/o neurogenic claudication" on March 25, 2015.  (R. at 338.)

Here, Plaintiff's alleged onset date is April 4, 2013 and the date last insured is December 31, 2013.  The June 21, 2013 NCS/EMG Report (R. at 295-299) was addressed by the ALJ, and the remaining medical records post-date the DLI.  Thus, the ALJ appears to have accurately observed that "[t]he medical records do not reveal objective medical evidence showing conditions warranting [Dr. Petty's] suggested limitations until after December 31, 201[3]."  (R. at 25.)  Moreover, while the ALJ did not adopt all of Dr. Petty's exertional limitations, the ALJ

18

effectively incorporated some of Dr. Petty's limitations ("shifting positions at will from sitting, standing or walking," and use of an assistive device) when she implemented the "sit/stand option at will" and requirement for "use of a cane while walking but not while standing at a work station." (R. at 24-25, 323.) As Plaintiff acknowledges, the regulations "expressly require only that the ALJ's decision include 'good reasons ... for the weight ... give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). (DE 15 at 16, DE 19 at 4.) As explained above, "good reasons" were given for the discounted treatment of Dr. Petty's medical source statement.

### G.  Conclusion

In sum, there are a significant number of jobs in the national economy that Plaintiff can perform, and Plaintiff has failed to show reversible error in the ALJ's treatment of Dr. Petty's medical source statement. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (DE 14), **GRANT** Defendant's motion for summary judgment (DE 18), and **AFFIRM** the Commissioner of Social Security's decision.

## III.  PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service,

19

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated:  February 15, 2018          s/Anthony P. Patti
                                   Anthony P. Patti
                                   UNITED STATES MAGISTRATE JUDGE

**<u>Certificate of Service</u>**

I hereby certify that a copy of the foregoing document was sent to parties of record on February 15, 2018, electronically and/or by U.S. Mail.

                                      s/Michael Williams
                                      Case Manager for the
                                      Honorable Anthony P. Patti